2026 IL App (2d) 250361-U
No. 2-25-0361
Order filed July 17, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

NOEL TAVIZON, Defendant-Appellant

Appeal from the Circuit Court of Kane County.
Honorable David P. Kliment, Judge, Presiding.
No. 23-CF-2636

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

## ORDER

¶ 1    *Held*:  Having found no arguably meritorious issue for appeal, we permit the appellate defender to withdraw, and we affirm the trial court's judgment.

¶ 2    Following a bench trial, defendant, Noel Tavizon, was found guilty of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2022)), a Class 2 felony (*id.* § 11-1.60(g)), stemming from his act of grabbing the breast of his 17-year-old daughter, N.T. The trial court sentenced defendant to 36 months' probation and 30 days in jail. The court also ordered defendant to successfully complete sex offender treatment, comply with all conditions of probation, and have no contact with N.T. Defendant timely appealed, and the trial court appointed the Office of the

State Appellate Defender (OSAD). Appellate counsel has moved to withdraw. We grant the motion and affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4    N.T. testified that she was born on November 30, 2005. Defendant was her father; Diana Rivera was her mother. N.T. testified that her parents have been divorced her "whole life." N.T. lived with Rivera and visited defendant "one to three times a month."

¶ 5    In October 2023, defendant invited N.T. to go shoe shopping. N.T. went to defendant's house, where defendant lived with his mother and grandmother. Defendant was the only person home at the time. N.T. was sitting next to defendant on the couch, watching TV, when defendant began asking her "sexual questions." Defendant asked N.T. "if [she's] doing it, if [she's] taking birth control." N.T. testified: "He asked me my bra size, and he grabbed my breast, and he asked me if we would go to hell if we ever did anything." N.T. told defendant her bra size, and defendant responded, "That's a good size." N.T. "got uncomfortable, and [she] tried to leave."

¶ 6    According to N.T., when defendant grabbed her breast, "[h]e went in [her] shirt and from the top and under [her] bra." His hand made skin-to-skin contact with her breast. When asked for how long he grabbed her breast, she replied, "Probably, like, five seconds, maybe." She stated that "[h]e squeezed it and just feeling around." N.T. saw that "defendant's penis was sticking out." She stated that she "saw it through his pants." N.T. told defendant that she "was on [her] period and that [she] had to go."

¶ 7    After telling defendant that she had to leave, N.T. walked out to her car. Defendant followed her and asked her if she needed money. She told him, no, and he sent her $100. Before this incident, defendant gave her money "[p]robably every couple weeks." Prior to this incident, her relationship with defendant had been "good" and she loved him.

¶ 8    N.T. testified that defendant had reached out to her via text message after the incident. N.T. identified People's exhibit No.1 as text messages they exchanged, and the messages were admitted without objection. The messages were dated October 11 and 12, 2023. In the exchange, N.T. sent defendant a message expressing disgust and outrage, stating, "It's not right what you did and i hope you know you lost your only daughter. I'll never look at you the same again. I never want to talk or see you again. *** I just hope you know what you did is disgusting and disrespectful. I hope you get the help you need and don't do this again to anyone. *** You're a pig." Defendant sent several messages in response. He stated, "You have this all wrong. I'm very concerned about you," insisting that he had asked her if she was sexually active only because he had been at a young age. He commented, "That's fked up that you accused me of some ridiculous things." N.T. responded, "Accusing you? You reached in my shirt and grabbed my bare tit and you had a boner. You asked me if we'd go to hell if we did anything. You fucked it all up[.]" Defendant replied that N.T. was lying, that he "never said anything like that." Later in the messages, defendant asked, "So are you going to stick to this or can we be ok and stop all the accusations? I don't want to loose [*sic*] you." Defendant sent N.T. additional messages on October 12. Defendant asked if N.T. still wanted him to buy her "the CarPlay" and she replied, "Yeah you can if you want."

¶ 9    On cross-examination, N.T. testified that she recalled talking with Thomas Ruzevich, an investigator at the Kane County Child Advocacy Center (CAC), about the incident. She agreed that she told Ruzevich that defendant referred to her bra size as "a fun size." She also agreed that she testified on direct examination that defendant referred to her bra size as "a good size." She clarified that he said, "fun size," not "good size." She did not recall telling Ruzevich that defendant touched her breast for one second rather than five seconds. She recalled telling Ruzevich that she tried to leave when defendant asked her if she thought they would go to hell. N.T. further testified

that the incident happened on October 7, 2023, and that defendant was wearing basketball shorts. N.T. testified that she told Rivera what happened the next day. She told her school counselor what happened sometime during the week of October 9, 2023. Defense counsel showed N.T. text messages between N.T. and defendant that included messages sent on October 7, 8, and 9, 2023. (They were marked as Defendant's Group Exhibit No. 1 but were not admitted into evidence.) N.T. agreed with defense counsel's statement that from October 7th through October 9th, she was having a "friendly conversation" with defendant.

¶ 10    Meghan Cochran, a school counselor at West Aurora High School, testified that she met with N.T. on October 31, 2023. She had known N.T. since N.T. was a freshman. This was not the first time she had met with N.T. that school year. When she met with N.T. on October 31, 2023, N.T. was "very emotional" and "she disclosed some very personal information." Cochran was a "mandated reporter" and, as such, was legally responsible to report any suspected cases of abuse or neglect to the Department of Children and Family Services (DCFS). Based on N.T.'s disclosure, Cochran made a report to DCFS. According to Cochran, the first time N.T. disclosed anything to Cochran that Cochran was mandated to report was on October 31, 2023.

¶ 11    Ruzevich testified that he began an investigation into defendant on November 1, 2023, as a result of a referral from DCFS. As part of the investigation, he interviewed N.T. According to Ruzevich, N.T. "started out composed, and then when the interview ended, she made a disclosure. She was visibly upset. She was crying." On cross-examination, Ruzevich testified that he interviewed N.T. on November 7, 2023. Ruzevich agreed that N.T. (1) told him that defendant "had touched her breast for, like, a second," (2) did not remember what defendant was wearing, and (3) never told him that she tried to leave when the conversation became uncomfortable. After

the interview, N.T. forwarded to Ruzevich copies of text messages that she had exchanged with defendant on October 11, 2023.

¶ 12    Following the State's evidence, defendant moved for a directed finding, which the trial court denied.

¶ 13    For the defense, defendant's mother—Dolores Tavizon—testified that she lived with defendant and her mother. N.T. was her granddaughter. Dolores testified that she worked on October 7, 2023, from 2 a.m. to 8 a.m. Dolores identified (as Defense exhibit No. 4) a copy of her timecard showing that she clocked out of work at 8 a.m. on October 7, 2023. Dolores testified that she was home when N.T. came over at 3 p.m. Dolores saw defendant and N.T. sitting together on the couch. N.T. did not look frightened or scared. She did not hear any conversations about sex or breasts. N.T. left at about 5 p.m. Dolores was in the kitchen and N.T. told her that she was leaving. N.T. looked "normal." On cross-examination, Dolores agreed that defendant and N.T. were supposed to go shoe shopping that day, but they did not go because N.T. left. Dolores denied telling Rivera that she was not home when N.T. was over that day.

¶ 14    In rebuttal, Rivera testified that Dolores told her that she was not home when the incident occurred and "that she wished she would have been there so that wouldn't have happened."

¶ 15    The trial court found defendant guilty of aggravated criminal sexual abuse. In issuing its factual findings, the court stated that the case "falls squarely on the credibility of the witnesses." The court found that both Cochran and Ruzevich were credible and had no reason to lie. The court indicated that N.T.'s testimony was the most important evidence. The court emphasized that N.T. "was a very credible witness." The court found that N.T.'s testimony was "believable" and that "[h]er demeanor on the witness stand add[ed] to [her] credibility." The court acknowledged that there were "some inconsistencies" in N.T.'s. Nevertheless, the court stated that "there are always

inconsistencies, and it would be more surprising if there were not inconsistencies." The court further noted that "[t]he fact that [N.T.] remembers something differently than she did even just a year and a half ago is not surprising. The fact that she might remember more details is also not surprising." Further, the court indicated that the text exchanges between N.T. and defendant were "very telling," noting that it appeared that defendant was trying to make N.T. doubt her own memory of what had happened.

¶ 16   Defendant filed a motion for a new trial, which the trial court denied.

¶ 17   At the sentencing hearing, N.T. and Rivera both read victim impact statements. Defendant asked for "leniency." The State asked for 48 months' sex offender probation and 30 days in jail, while the defense asked for 18-to-24 months' probation without a jail sentence. The trial court sentenced defendant to 36 months' probation and 30 days in jail. The court also ordered defendant to successfully complete sex offender treatment, comply with all conditions of probation, and have no contact with N.T. Defendant did not file a motion to reconsider sentence but filed a timely notice of appeal.

¶ 18   Per *Anders v. California*, 386 U.S. 738 (1967), and *People v. Jones*, 38 Ill. 2d 384 (1967), the appellate defender moves to withdraw as counsel. In her motion, counsel states that she read the record and found no issue of arguable merit. Counsel further states that she advised defendant of her opinion. Counsel supports her motion with a memorandum of law providing a statement of facts and an argument as to why this appeal presents no issue of arguable merit. We advised defendant that he had 30 days to respond to the motion. That time is past, and defendant has not responded.

¶ 19                                    II. ANALYSIS

¶ 20    Counsel identifies as potential issues whether (1) defendant knowingly and intelligently waived his right to a jury trial; (2) defense counsel was ineffective for failing to object to the admission of (a) the text message exchange between defendant and N.T. and (b) Cochran's and Ruzevich's testimony; (3) defendant was proved guilty beyond a reasonable doubt, and (4) the sentence constitutes an abuse of discretion. We agree with counsel that none of these issues have arguable merit.

¶ 21                              A. Validity of Jury Waiver

¶ 22    First, counsel is correct that it would be frivolous to challenge the validity of defendant's jury waiver. The right to a trial by jury is a fundamental right guaranteed by the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const.1970, art. I, §§ 8, 13). "Every person accused of an offense shall have the right to a trial by jury unless *** understandingly waived by [the] defendant in open court." 725 ILCS 5/103-6 (West 2022). Similarly, case law "impose[s] on a trial court the duty of ensuring that a defendant waives the right to a jury trial expressly and understandingly" (*People v. Bannister*, 232 Ill. 2d 52, 66 (2008)) in open court (*People v. Bracey*, 213 Ill. 2d 265, 270 (2004)). "However, a trial court need not give any specific admonition or advice for a defendant to make an effective jury waiver." *Bannister*, 232 Ill. 2d at 66. A signed written waiver, though not indispensable for a valid waiver (*Bracey*, 213 Ill. 2d at 270), "allow[s] a court to review the record to ascertain whether a defendant's jury waiver was made understandingly" (*Bannister*, 232 Ill. 2d at 66).

¶ 23    Here, the trial court was presented with a jury waiver signed by defendant. The court advised defendant of the differences between a jury trial and a bench trial. Defendant indicated his understanding of the differences. Defendant confirmed that he had spoken with counsel about the

decision and that he wished to waive his right to a jury trial. Defendant confirmed that no promises had been made to him about what the court might do at the bench trial and that no one threatened or coerced him to give up his right to a jury trial. Defendant was shown the jury waiver and confirmed that he signed it. Defendant also confirmed that he was not under the influence of any alcohol, drugs, or prescription medication that might impair his ability to understand what he was doing. We see no arguable basis in the record for disputing the validity of the jury waiver.

¶ 24                                    B. Ineffective Assistance of Counsel

¶ 25    Second, counsel is correct that it would be frivolous to argue that defense counsel was ineffective for failing to object to the admission of (a) the text message exchange between defendant and N.T. and (b) Cochran's and Ruzevich's testimony. Claims of ineffective assistance of counsel are reviewed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To establish a claim of ineffective assistance of counsel, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Patrenko*, 237 Ill. 2d 490, 496 (2010). To satisfy the prejudice prong of the *Strickland* test, the defendant must prove there is a "reasonable probability" that the outcome of the trial would have been different had his lawyer not been ineffective. *Strickland*, 466 U.S. at 692. A defendant must satisfy both prongs of the *Strickland* test to maintain a claim of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 26                                    1. Text Messages

¶ 27    Counsel considered arguing that defense counsel was ineffective for failing to object to the admission of the text message exchange between defendant and N.T. (People's exhibit No. 1) as inadmissible hearsay. " 'Hearsay' is a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Subject to exceptions provided for by rule or statute, hearsay is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). Statements by a party-opponent are not hearsay. Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015).

¶ 28    Regarding defendant's statements in the text messages, we agree that defendant's statements are not hearsay because they are statements by a party-opponent. Thus, it would be frivolous to argue that defense counsel was deficient for failing to object to the admission of defendant's text messages.

¶ 29    Regarding N.T.'s statements in the text messages, we agree with counsel that, even if the statements were improperly offered for the truth of matter asserted, defendant could not establish that he was prejudiced by the admission. First, we note that when a case is tried before a judge rather than before a jury, a reviewing court "presumes that the trial court considered only admissible evidence and disregarded inadmissible evidence in reaching its conclusion." *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). This "presumption may be rebutted where the record affirmatively shows the contrary." *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977). Here, in finding defendant guilty, the court emphasized N.T.'s trial testimony, focusing on "the way she described the actions of that day" as well as "her demeanor on the witness stand." Although the court later referenced the text messages, its focus was primarily on "defendant's responses to what [N.T.] says," noting that defendant was "basically trying to talk her out of believing what she experienced." Thus, even if the admission of N.T.'s messages was error, it would be frivolous to argue that defendant was prejudiced by defense counsel's failure to object, where the record does not affirmatively show that the court considered the text messages for an improper purpose.

¶ 30                    2. Ruzevich's and Cochran's Testimonies

¶ 31    Counsel considered arguing that defense counsel was ineffective for failing to object to Ruzevich's and Cochran's and testimonies based on relevancy. Both Ruzevich and Cochran testified that N.T. made disclosures to them and that she was emotional when she did so. Counsel notes that the evidence was admissible only if N.T.'s disclosures concerned the present offense. See Ill. R. Evid. 402 (eff. Jan. 1, 2011) ("Evidence which is not relevant is not admissible."); Ill. R. Evid. 401 (eff. Jan. 1, 2011) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). "[W]here the relevance of evidence depends on unproved assumptions it is inadmissible." *People v. Jones*, 108 Ill. App. 3d 880, 884 (1982).

¶ 32    Here, we agree with counsel that it was reasonable to infer that both Ruzevich's and Cochran's testimonies related to the present offense and thus were relevant. Ruzevich testified that he began his investigation on November 1, 2023, after receiving a referral from DCFS, and that he spoke with N.T. on November 7, 2023. N.T. testified that she spoke with Ruzevich about the incident on November 7, 2023. Thus, the trial court could reasonably infer that Ruzevich's testimony was relevant to the present offense. N.T. also testified that she spoke with Cochran about the incident. Although N.T. stated that she spoke with Cochran the week after the incident, Cochran testified that the first time N.T. told her anything that Cochran was mandated to report was on October 31, 2023. Thus, the court could reasonably infer that Cochran's conversation with N.T. on October 31, 2023, concerned the present offense. Accordingly, it would be frivolous to argue that defense counsel was deficient for failing to object to Ruzevich's and Cochran's testimonies.

¶ 33                          C. Sufficiency of the Evidence

¶ 34    Third, counsel is correct that there is no potential merit in arguing that the evidence was insufficient to prove defendant guilty beyond a reasonable doubt of aggravated criminal sexual abuse. When a reviewing court is presented with a criminal defendant's challenge to the sufficiency of the evidence, it should not retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Instead, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). "[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 243 (2009).

¶ 35    Here, the State was required to prove beyond a reasonable doubt that defendant "commit[ed] an act of sexual conduct with a victim who is under 18 years of age and the person is a family member." 720 ILCS 5/11-1.60(b) (West 2022). " 'Family member' " includes, among others, "a parent." *Id.* § 11-0.1. " 'Sexual conduct' means any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organ, anus, or breast of the victim or the accused *** for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* Sexual gratification may be proven through circumstantial evidence, including an erection or sexually explicit comments. *In re M.H.*, 2019 IL App (3d) 180625, ¶ 17.

¶ 36    We first note that N.T. was unquestionably defendant's daughter and was born on November 20, 2005. Thus, she was a family member and under 18 years of age at the time of the

offense. Concerning the remaining elements, N.T.'s testimony was sufficient to prove defendant guilty beyond a reasonable doubt. N.T. testified that, in October 2023, defendant reached into her shirt and grabbed her breast with his hand, making skin-to-skin contact. She also testified that he was asking her sexual questions, made comments about her bra size, and had an erection. These facts suggest that defendant touched N.T.'s breast for the purpose of sexual gratification.

¶ 37 Defense counsel argued that N.T.'s testimony was fabricated because (1) N.T. reported for the first time on cross-examination that the incident occurred on October 7, (2) it was not believable that N.T. told Rivera about the incident the next day given that the police did not get involved until October 31, (3) N.T. admitted having normal conversations with defendant for several days afterwards, (4) N.T. testified that defendant was wearing shorts but told Ruzevich that she could not remember what he was wearing, and (5) N.T. testified that defendant touched her breast for five seconds but told Ruzevich it was one second.

¶ 38 We agree with counsel that these challenges to the evidence would not warrant reversal. First, as counsel notes, it is highly unlikely that N.T. fabricated the date of the incident at trial. Indeed, it appears that defense counsel *was* aware that the incident was alleged to have occurred on October 7, 2023, prior to N.T.'s trial testimony given that defense counsel had obtained and admitted at trial Dolores's time sheet for October 7. Second, as counsel notes, there are any number of reasons why Rivera may not have reported the incident after being told about by N.T. the day after it had occurred. For instance, Rivera may not have understood that the conduct was a crime, or she may not have wanted N.T. to be subject to the scrutiny and stress of a criminal investigation. Third, as counsel notes, even if N.T. had waited three weeks before disclosing the incident and communicated with defendant in the days following the incident, this does not render her testimony so incredible as to create reasonable doubt. See *In re M.G.*, 2024 IL App (1st) 232106, ¶ 29

(recognizing fear, shame, and guilt as motives to remain silent about sexual abuse in families); *People v. Duplessis*, 248 Ill. App. 3d 195, 199-200 (1993) ("In sexual assault cases involving family relationships, the victim's credibility is not lessened if there is no immediate outcry."). As for the remaining minor inconsistencies noted by defense counsel in closing argument, they were acknowledged by the trial court and found to be typical of a victim testifying over a year after the offense. Where the trial court, sitting as the trier of fact, properly weighed the credibility of the witnesses and properly resolved any conflicts in the evidence, there is no arguable claim that the State failed to meet its burden to prove defendant guilty beyond a reasonable doubt. See *Siguenza-Brito*, 235 Ill. 2d 213 at 243.

¶ 39 Viewing the evidence in the light most favorable to the State, as we must, we agree with appellate counsel that any claim that defendant was not proved guilty beyond a reasonable doubt of aggravated criminal sexual abuse is without arguable merit.

¶ 40                                   D. Sentencing Error

¶ 41 Last, counsel is correct that it would be frivolous to argue that the sentence constitutes an abuse of discretion. The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, ¶ 11. It is well settled that the trial court is afforded broad discretionary powers in imposing a sentence, and a trial court's sentencing decision will not be disturbed upon review absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). When a sentence falls within the statutorily prescribed range, it will not be found to be excessive or an abuse of discretion unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.*

¶ 42    Defendant's aggravated-criminal-sexual-abuse conviction (720 ILCS 5/11-1.60(b) (West 2022)) was a Class 2 felony (*id.* § 11-1.60(g)), punishable by a term of imprisonment of not less than three years and not more than seven years or a period of probation not to exceed four years (730 ILCS 5/5-4.5-35(a), (d) (West 2022)). The State asked that defendant be placed on 48 months' sex offender probation and be sentenced to 30 days in jail. Defense counsel suggested a probation term of 18 to 24 months.

¶ 43    The trial court's sentence of 36 months' sex offender probation and 30 days in jail was well within the statutory range. In aggravation, the court found that (1) defendant's conduct caused or threatened serious psychological harm, (2) defendant had a prior criminal history, (3) punishment was necessary to deter others, and (4) defendant was in a position of trust. In mitigation, the court found that (1) defendant's conduct was the result of circumstances unlikely to recur, (2) defendant's character and attitude indicated that he is unlikely to commit another crime, and (3) defendant was particularly likely to comply with the terms of probation. It is not arguable that defendant's sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense.

¶ 44    Counsel considered arguing whether it may have been improper for the trial court to consider in aggravation that defendant was in a position of trust, where the fact that he was a family member was an element inherent in the offense. We agree with counsel that there is no potential merit to this argument.  In *People v. Madura*, 257 Ill. App. 3d 735, 739 (1994), we held that it is "appropriate to consider the nature and degree of a defendant's position of trust or supervision regarding a child/victim, even where the criminal sexual assault charge requires proof of a familial relationship as an element of the crime." Accordingly, the court did not err in considering defendant's position of trust.

¶ 45    Counsel further notes that, even if the trial court's consideration was improper, the issue was not preserved because counsel did not file a motion to reconsider the sentence. See 730 ILCS 5/5-4.5-50(d) (West 2024) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed with the circuit court clerk within 30 days following the imposition of sentence."); *People v. Hillier*, 237 Ill. 2d 539, 544 (2010) ("It is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). Thus, to prove reversible error, defendant would need to establish either plain error or ineffective assistance of counsel. See *People v. Dorsey*, 2023 IL App (1st) 200304, ¶ 67 (a claim not raised before the trial court may be reviewed for plain error or ineffective assistance of counsel). We agree with counsel that any such argument would be frivolous.

¶ 46    Sentencing errors are reviewed under the first prong of plain-error review. See *People v. Johnson*, 2024 IL 130191, ¶ 92. Under that prong, an error rises to the level of plain error only "when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Id.* ¶ 43 (quoting *People v. Moon*, 2022 IL 125959, ¶ 21). Here, the trial court only briefly referenced defendant's position of trust when listing all the aggravating factors. Given the trial court's sentence, which was significantly well below the possible maximum sentence of seven years imprisonment and between term probation terms suggested by defendant and the State, we cannot say that consideration of the factor (if erroneous) tipped the scales of justice against defendant. For the same reason, any potential ineffective-assistance-of-counsel argument fails. See *Henderson*, 2013 IL 114040, ¶ 11 (a claim of ineffective assistance of counsel fails where the defendant cannot establish that a reasonable probability exists that, absent the error, the result of

the proceeding would have been different); see also *People v. White*, 2011 IL 109689, ¶ 133 (the prejudice prong for ineffective assistance of counsel is similar to the first-prong plain-error analysis).

¶ 47    After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit.

¶ 48                                III. CONCLUSION

¶ 49    For the reasons stated, we grant counsel's motion to withdraw, and we affirm the judgment of the circuit court of Kane County.

¶ 50    Affirmed.